## Favorite v. Diulus Construction Co.

Before Soffel, Weiss and Thompson, JJ.

*John H. Lauer*, for plaintiff.

*J. Roy Dickie, Hamilton A. Robinson* and *Harold E. McCamey* and *Samuel M. Pasquarelli*, for defendant.

THOMPSON, J., November 28, 1951.—We have before us a motion for judgment n. o. v. on the part of defendant and a motion for a new trial on the part of plaintiff.

The action was in trespass to recover for damages sustained by the homestead property of plaintiff by reason of a landslide.

On April 30, 1926, plaintiff and her husband, Fred Favorite, obtained title to the major portion of a lot of ground upon which was erected a two-story brick and frame dwelling house, which is known as 1744 Perrysville Avenue, in the twenty-fifth ward of the City of Pittsburgh, County of Allegheny and State of Pennsylvania. Later, on July 11, 1945, plaintiff and her husband obtained title to a strip of ground having a width of a little over three feet and bordering their original purchase on the West. The last named strip of land abutted on the property of the Protestant Orphans' Asylum, which fronted not only on Perrysville Avenue but on both sides of Clayton Avenue, which was located north of Perrysville Avenue.

On the night of February 13, 1949, the surface of the ground of the portion of the orphanage property lying to the northwest of plaintiff's property and including also the surface of an adjoining property lying south of Clayton Avenue, both of which were on a considerably higher elevation than plaintiff's property, began to slide. As a result, a very considerable amount of earth and debris was swept onto the prop-

erty of plaintiff and brought about, according to her contention, the total destruction of the market value of her home.

In the testimony it developed that in the year 1948 the City of Pittsburgh entered into a contract with defendant, Diulus Construction Company, Inc., for the grading, paving and curbing of Clayton Avenue. In the course of this work a considerable amount of excavation was made by the contractor amounting, according to his testimony, to 5,859 cubic yards of earth. This considerable amount of fill was distributed at various places along Clayton Avenue.

Defendant Diulus testified that he deposited 700 cubic yards of fill upon the property of the orphanage. Later, when questioned as to the dimensions of the deposit made upon the orphanage, he said:

"Yes, sir. On those figures it totals up 1,166 cubic yards on the orphanage property, that is, if the ground were perfectly level, but it was not level. It sloped."

The property of plaintiff, as was before stated, was on the north side of Perrysville Avenue. Perrysville Avenue winds its way up around the side of a steep hill. A stone wall made of large heavy stone has been built as a retaining wall on the north side of Perrysville Avenue and extending for a considerable distance including the frontage of the property of plaintiff. The house of plaintiff is located from 20 to 25 feet above the surface of Perrysville Avenue. The slope of the hillside from plaintiff's property is upward in a northwesterly direction over the property of the orphanage.

A short distance north of Clayton Avenue on the property of the orphanage there was located an old spring with a spring house, which had not been in use for some years prior to the improvement of Clayton Avenue, and the overflow of this spring led down

to a watering trough, the niche for which now appears in the stone retaining wall on Perrysville Avenue before mentioned. This watering trough has disappeared although the place where it is located is still quite obvious and the location is on the Perrysville Avenue frontage of the orphanage a short distance from plaintiff's property.

On the night of February 13, 1948, there were ominous sounds observable by the people in the vicinity, which seemed to indicate that a landslide was beginning. Defendant Diulus had notice of this development and at once came upon the property and by direction of the engineer of the City of Pittsburgh in charge took steps to remedy the situation and removed 100 truck loads of dirt from the deposit on or near the orphanage property; 97 loads according to defendant Diulus were removed from the orphanage property and the remainder from other adjacent property.

An expert witness for plaintiff, Robert M. Douglass, a civil engineer, estimated that the amount of fill during this landslide deposited upon plaintiff's property was 700 cubic yards. On being examined as to the cause of the slide, he said:

"Well, I don't think that there was any question but that the slide was caused by the mistake that was made with putting a fill like that on a hillside of that kind, and as the rains came from time to time the fill was increased in weight and the weight of the fill probably—I rather think it did—broke the original surface with the result that the water went down along there and I think that was the reason why the difficulty that I found in front of the house—I think that was the reason for it. The water went down along under the property there and came out on the slope—on the Perrysville Avenue terrace."

And again—

"As the fill was in the first place, it was a reasonable surface, somewhat parallel with the original surface. As it was left then there were holes in it. It was holding water. There was water in it when I saw it and that water was the cause of more difficulty and giving more weight to the burden that had been put on the original surface and was evidently causing a movement of the fill."

Another expert witness, Benjamin H. Aires, also a civil engineer who was called by plaintiff, did not have the advantage enjoyed by Mr. Douglass of seeing the property when the slide was in progress. When questioned as to the cause of the slide, he said:

"I would state that the slide was caused by earth being deposited up above Clayton Avenue and rain saturating it and causing it to slide down the hillside."

In establishing the measure of damages, the two witnesses above named were examined as to what it would cost to restore the property of plaintiff to its original condition. Mr. Douglass enumerated various items of cost amounting to a total of $16,700, and Mr. Aires $14,900.

Plaintiff produced two expert real estate witnesses to testify as to the market value of the property. William F. Shaughnessy, one of these witnesses, said that the property had a fair market value prior to the landslide of $10,000 and that it was entirely valueless after the slide had taken place. Harold F. Burnworth, the other expert real estate witness, established the fair market value of plaintiff's property prior to the slide at $10,500 and said that it had no value at all in its present condition, that it was not a marketable property.

Since the cost of restoration was greater than the difference between the market value of the property

before and after, and since the property according to plaintiff's witnesses had no market value after the slide, plaintiff's measure of damages was from $10,000 to $10,500, if her witnesses were deemed credible.

The defense contends that defendant had deposited the fill in the orphanage property and adjacent properties in a perfectly safe way and in a safe place and that the landslide was not caused by any operations on his part but by filling, which he alleged, was made by a man named "Main", who occupied a house fronting on the South side of Clayton Avenue and being adjacent to the orphanage property.

As to the measure of damages, Carmen Tropea, a general contractor and a former senior assistant construction engineer for Allegheny County and other organizations, testified that the cost of restoring the property to its original condition would be $6,059.90. A real estate expert, Thomas McCaffrey, Jr., testified that the market value of plaintiff's property prior to the slide was $7,500 and after the slide $3,500 or a net depreciation in market value of $4,000.

Plaintiff and her husband, Fred Favorite, held title to their homestead by entireties. Fred Favorite died in the year 1950, after the landslide took place and after this suit was brought. His widow, Josephine Favorite, thereby became the sole plaintiff in the case. The jury rendered a verdict in her favor of $3,000.

We will consider first defendant's motion for judgment n. o. v.

It is the contention of defendant that no negligence on the part of defendant was shown that could sustain a verdict against it.

At the oral argument before the court en banc, it was suggested by Judge Soffel that the case might have been tried as trespass quare clausum fregit and that in such an action, if the proof showed trespass

upon the property, negligence was not an essential element in the proof.

The deposits of fill made by defendant company were mainly upon the property of the orphanage adjacent to the property of plaintiff and higher up on the hillside. It was a very steep hillside according to all the testimony in the case, but there was testimony on the part of plaintiff that no landslide had ever occurred for a period of at least 80 years. This testimony was given by a witness 85 years of age, who together with his family had owned a considerable amount of property on Perrysville Avenue including originally the property purchased by plaintiff and her husband. This witness was James McGrew.

Mr. McGrew said that he had lived in this vicinity all his life and that in the Perrysville Hill there was a slope of from 30 to 45 degrees. He testified that he had formerly been a structural draftsman and had done surveying work. No part of this fill according to the testimony reached or damaged plaintiff's property until the landslide began on February 13, 1949.

If the action had been tried as one quare clausum fregit, plaintiff obviously would have had an easier time making out a case. However, in view of all the facts above set forth, we are of the opinion that there was a question for the jury whether or not there had been negligence on the part of defendant company, and this negligence was the proximate cause of the undoubted damage which resulted.

We think that the motion for judgment n. o. v. should be refused.

We turn now to plaintiff's motion for a new trial on the ground of inadequacy of the verdict.

If plaintiff's testimony as to the market value of the property is credible, the verdict was at least $7,000 less than it should have been. Defendant's testimony that the cost of restoration of the property was $6,-

059.90 and the real estate testimony of the market value before was $7,500 and the market value after was $3,500 or a difference in market value of $4,000 indicates that the verdict of the jury was even less than the figures of defendant's witnesses.

After the jury was sworn, they were taken to view this property and after the oral argument before the court en banc the trial judge together with counsel on both sides visited the premises.

It would appear from the testimony that the verdict falls very far short of recompensing plaintiff for the damages suffered.

It has been earnestly argued by the able counsel for plaintiff that the trial judge improperly submitted the measure of damages to the jury. If we understand the position of counsel it is to the effect that the measure of damages was the lesser of two figures, either the cost of restoration, or the market value of the property before the damage. As far as plaintiff's testimony was concerned, no difficulty arose because plaintiff's witnesses testified that there was no market value at all after the landslide took place and consequently the market value before constituted the damage and being less than the cost of restoration was the amount to which plaintiff was entitled.

Defendant's expert witness, however, gave the property a market value of $3,500 after the damage. If defendant's market value before the damage was the proper figure to be considered rather than the difference between before and after, then the cost of restoration, according to defendant's testimony, was less than the market value before and should represent the damage suffered according to defendant at $6,059.90.

We think, however, that the correct measure of damages is stated in plaintiff's point, which the trial

judge approved and read to the jury at the close of the charge as follows:

"Prima facie, the measure of damages in this case is the cost of removing the deposits of earth from the property of plaintiff and restoring the property to its former condition, together with compensation for the loss of use and enjoyment of the property in the meantime. If, however, the cost of removing the deposit and restoring the property to its former condition will be greater than the injury from it, if allowed to remain, then the true measure of damages is the difference of fair market value of the property before and after the slide."

However, we have come to the conclusion that a new trial should be granted to plaintiff on the ground of the inadequacy of the verdict. Such being the case, it would seem that any difficulty about the measure of damages should now be regarded as academic.